# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : Case No. 2:08-cr-62 |
| v. | : Judge Holschuh |
| THOMAS W. WILLIAMS, | : |
| Defendant. | : |
| | : |

## MEMORANDUM OPINION AND ORDER

Defendant Thomas W. Williams ("Defendant") is charged with one count of possessing a firearm while having a prior felony conviction, and one count of possessing ammunition while having a prior felony conviction, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment, doc. # 2.) He has filed a Motion to Suppress Physical Evidence and Statements (doc. # 16), asking the Court to suppress from evidence the firearm and ammunition that police officers found him carrying. The Court held an evidentiary hearing on Defendant's Motion on June 25, 2008. For the following reasons, Defendant's Motion is **GRANTED**.

I.  **Background**

Community Properties of Ohio ("CPO") is a subsidized property management company that provides affordable housing to low-income individuals throughout Columbus. (Test. of Joshua Martin, Suppression Hr'g. Tr. p. 6-7 ("Martin Test.").) Because a large number of CPO's properties are in high crime areas, CPO has instituted several security programs, one of which is to hire Columbus Police Department officers to patrol CPO properties as special duty officers. (Id. p. 7.) These special duty officers, who work in full Columbus Police Department uniforms and drive

marked Columbus Police Department cruisers, patrol CPO properties and strictly enforce criminal laws and CPO regulations prohibiting, among other things, trespassing and loitering in an attempt to "eliminate the elements" of crime. (Test. of Robert Vass, Suppression Hr'g. Tr. p. 34 ("Vass Test.").)

Signs that prohibit trespassing and state that trespassers will be prosecuted are posted on all CPO properties (Def. Supp. Mem. ex. 2, doc. # 32), and special duty officers patrolling CPO properties will engage nonresidents in conversation to determine if they are trespassing. If the nonresident can provide some information indicating that they are a resident's guest, such as a resident's name, or a valid reason for being on the property, then the special duty officer will do nothing other than warn the nonresident that trespassing is prohibited. (Vass Test. p. 38, 52.) If the nonresident cannot provide information indicating that they are a resident's guest, or if a special duty officer has to talk to a nonresident about trespassing a second time, the nonresident's name and picture or other identifying information will be entered into the CPO's trespass logbook, a record of all individuals who have been given trespass warnings. (Martin Test. p. 11; Vass Test. p. 37.) If a nonresident trespasses on CPO property after having his or her name entered in the logbook, the nonresident is arrested for criminal trespass and taken to jail. (Vass Test. p. 37.) The special duty officers, however, have discretion to address situations on a case-by-case basis, and do not have to go through the process of issuing warnings before arresting an individual for criminal trespass. (Id. p. 38-39.)

At approximately 9:00 p.m. on October 12, 2004, Columbus Police Department Officers Robert Vass ("Vass") and T. Pappas ("Pappas") were working special duty patrol for CPO. (Id. p. 38-39.) Vass and Pappas were in their cruiser heading southbound on Wilson Avenue to inspect a

CPO property located at 1084 East Whittier Street. (Id. p. 39.) As they turned onto East Whittier from Wilson Avenue, Vass and Pappas observed a group of four to five individuals standing at various locations in front of 1084 East Whittier. Vass and Pappas parked their cruiser in front of the building and approached the group, and as they did Vass recognized Defendant, who was standing on the sidewalk in front of 1084 East Whittier and was leaning against a car parked in the street. (Id. p. 68; Map of 1084 East Whittier Street, Suppression Hr'g. Def. Ex. 1.) Vass recognized Defendant from a prior unrelated instance in which he had arrested Defendant in June 2004. Additionally, Vass testified that he had also given Defendant a verbal trespass warning after seeing him at 1084 East Whittier at some time after June 2004 and before October 2004. (Vass Test. p. 42-44.) Defendant's name had not been entered into the logbook as a result of this warning because he had indicated he was a resident's guest, but Vass had warned him not to trespass on CPO property. (Id.)

As he and Pappas approached Defendant, Vass told Defendant that "he was again trespassing on CPO property." (Arrest Information Report, Suppression Hr'g. Gov't. Ex. 3.)[1] Vass then asked Defendant if there were any outstanding warrants for his arrest, and Defendant replied that he thought there might be one related to his June 2004 arrest. Vass told Defendant he would run a

---

[1] At the evidentiary hearing, Vass initially stated that he first asked Defendant whether he knew any residents or had a reason for being on CPO property (Vass Test. p. 44), but then on cross-examination indicated that he did not remember if he said anything to Defendant prior to stating that Defendant was trespassing (Vass Test. p. 57). Vass later indicated that the narrative section of the Arrest Information Report, prepared shortly after Defendant's arrest and which indicated that the first thing Vass said to Defendant was that Defendant was "again trespassing", was the most reliable indication of what he actually said to Defendant. (Vass Test. p. 62.) Later, upon questioning by the Court, he stated affirmatively that the first thing he said to Defendant as he approached was that Defendant was trespassing. (Vass Test. p. 69-70.) The Cout finds that the account contained in the Arrest Information Report is the most credible account.

3

warrant check, and then asked Defendant if he was armed. (Vass Test. p. 46.) Defendant replied that he "had to protect himself," which Vass took to mean that Defendant was in fact armed. Vass told Defendant he was going to do a pat-down search, to which Defendant replied that he was carrying a gun, and when Vass conducted the pat-down search he discovered a firearm concealed under Defendant's shirt in the back waistband of his pants. Defendant was then handcuffed and arrested. (Id.; p. 70-71.)

Defendant was indicted on April 1, 2008 and charged with one count of possessing a firearm while having a prior felony conviction, and one count of possessing ammunition while having a prior felony conviction. (Doc. # 2.) He was arraigned on April 14, 2008 and pled not guilty to both counts (doc. # 12), and then filed this Motion on May 12, 2008. (Doc. # 16.) The Government responded (doc. # 19) and the Court held an evidentiary hearing on the Motion on June 25, 2008. At the Court's request Defendant submitted a post-hearing supplemental memorandum (doc. # 32), to which the Government responded (doc. # 33) and Defendant replied (doc. # 34).

## II. Applicable Law

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, see Mapp v. Ohio, 367 U.S. 643 (1961), provides: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. The Fourth Amendment's protection against unreasonable seizures does not apply unless a person is actually "seized," and "[n]ot every police/citizen encounter constitutes a seizure." United States v. Richardson, 949 F.2d 851, 855 (6th Cir. 1991). Courts recognize three types of police/citizen encounters: consensual encounters, investigatory detentions, and arrests. United States v. Davis, 514 F.3d 596, 607 (6th Cir. 2008).

4

In a consensual encounter, "law enforcement officers may ask citizens general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." Id. (internal quotations and citations omitted); see also United States v. Drayton, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen"). Consensual encounters do not implicate an individual's Fourth Amendment rights because the individual is not "seized" within the meaning of the Fourth Amendment. Florida v. Royer, 460 U.S. 491, 497 (1983).

Once a seizure occurs, however, the Fourth Amendment's protections are implicated. A Fourth Amendment seizure occurs when an officer restrains an individual's liberty by force, or when an individual submits to a show of authority that, in view of all the circumstances, would indicate to a reasonable individual that he or she was not free to leave. California v. Hodari D., 499 U.S. 621, 626-28 (1991); United States v. Mendenhall, 446 U.S. 544, 554 (1980); Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968). For a show of authority to constitute a seizure, the show of authority must be sufficient to indicate to a reasonable individual that he or she would not be allowed to walk away and end the encounter with the police, Mendenhall, 446 U.S. at 554, and the individual must submit to that show of authority, Hodari D., 499 U.S. at 626. This is an objective test. See Richardson, 949 F.2d at 855.

Courts look to the circumstances surrounding the encounter, Florida v. Bostick, 501 U.S. 429, 439 (1991) and factors such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or

5

tone of voice indicating that compliance with the officer's request might be compelled" to determine if a seizure has occurred. Mendenhall, 446 U.S. at 554; see also United States v. Richardson, 385 F.3d 625, 629 (6th Cir. 2004) ("[W]e recognize that words alone may be enough to make a reasonable person feel that he would not be free to leave"). The question of whether an individual has been seized or not is a highly fact specific one, however, and there is no bright line test for distinguishing a consensual encounter from a seizure. Royer, 460 U.S. at 506. The Government bears the burden of establishing that an encounter was consensual, not a seizure. Id. at 497.

If a Fourth Amendment seizure has occurred, a court must next determine what type of seizure occurred. Fourth Amendment seizures are grouped into two categories, each requiring a different degree of justification to make the seizure reasonable: investigatory stops and arrests.[2] Investigatory stops allow police officers to briefly detain an individual to investigate and confirm or dispel a belief that a crime is occurring. When evaluating the reasonableness of an investigatory detention, courts ask "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances [that] justified the interference in the first place." Id. at 20.

Reasonable suspicion that criminal activity may be afoot is necessary to justify an investigatory detention. This reasonable suspicion must be based on specific and articulable facts viewed objectively in light of the totality of the circumstances. See, e.g., United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Sokolow, 490 U.S. 1, 7 (1989). "[T]he concept of

---

[2] Although Defendant's initial Motion argued that Vass' seizure of Defendant rose to the level of an arrest (Def. Mot. Suppress p. 5, doc. # 16), after the evidentiary hearing Defendant revised his position and now argues that the encounter between Vass and Defendant was an investigatory detention. (Def. Supp. Mem. p. 2, doc. # 34.) Consequently, the Court will only discuss the law applicable to investigatory detentions, not arrests.

6

reasonable suspicion is somewhat abstract[,]" Arvizu, 534 U.S. at 274, and it cannot be reduced to a set of bright line rules, but it does have to be based on some specific and articulable facts that would support a reasonable belief for suspecting a particular person of criminal activity. United States v. Torres-Ramos, 536 F.3d 542, 552 (6th Cir. 2008). Additionally, when determining whether reasonable suspicion existed to justify an investigatory stop, courts "must give due weight to common sense judgments reached by officers in light of their experience and training." United States v. Saddler, 445 F.Supp.2d 862, 868 (S.D. Ohio 2006) (Spiegel, J.).

The manner in which the investigatory stop is conducted is also an important part of the inquiry, because the stop and its concurrent intrusion into the individual's personal liberty must be related in scope to the justification for the stop, and "must be temporary and last no longer than is necessary to effectuate the purpose of the stop. The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500. The reasonableness of the intrusion into an individual's liberty is "judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Smoak v. Hall, 460 F.3d 768, 779 (6th Cir. 2006).

### III. Analysis

#### A. Defendant was Seized within the Meaning of the Fourth Amendment

The parties initially dispute whether Vass and Pappas seized Defendant; Defendant argues that Vass' conduct when exiting his cruiser, approaching Defendant, and informing Defendant that he was "again trespassing on CPO property" would lead a reasonable individual to believe that he or she was not free to leave. (Def. Supp. Mem. p. 8-10, doc. # 32.) The Government argues that the encounter between Defendant and Vass and Pappas was consensual in nature because Vass and

Pappas were engaged in legitimate law enforcement activity, and because "there is absolutely no evidence in the record regarding any belief by [Defendant] that he was not free to leave upon first being approached by Vass." (Gov't. Resp. p. 6, doc. # 33.)

Viewing the encounter in light of all the circumstances, the Court finds that Defendant would not have felt free to ignore Vass' questioning and end his encounter with the police. Defendant was approached by two officers, Vass and Pappas, who arrived on the scene in a marked Columbus Police Department cruiser and dressed in Columbus Police Department uniforms. Upon exiting the cruiser, Vass and Pappas singled Defendant out of a group of four or five individuals, despite the fact that other individuals were clearly on CPO property and had open containers while Defendant was not on CPO property and did not have an open container. Vass had previously arrested Defendant in June 2004 and had later given him a verbal warning about trespassing at the 1084 East Whittier location, and the first thing that Vass said to Defendant as he approached was that Defendant was breaking the law by "again trespassing on CPO property." Furthermore, Defendant knew that repeated trespass on CPO property would result in arrest and prosecution, both from Vass' prior warning and from the large signs posted at the 1084 East Whittier building prohibiting trespassing and stating that violators would be prosecuted to the fullest extent of the law. (Def. Supp. Mem. ex. 2, doc. # 32.)

These objective circumstances satisfy the Mendenhall test. See 446 U.S. at 554. The "threatening presence of several officers" is a relevant factor in the analysis, see, e.g., United States v. Buchanon, 72 F.3d 1217, 1224 (6th Cir. 1995), and supports a finding that Defendant was seized. Vass and Pappas arrived on the scene in a marked Columbus Police Department cruiser and exited in full uniform. Once they did, they immediately singled Defendant out of a larger group and

8

approached him.  This would tend to "cause a reasonable person to feel intimidated or threatened by this type of police presence."  Id.  Additionally, as he approached, the first thing that Vass did was accuse Defendant of breaking the law by trespassing.  "[W]ords alone may be enough to make a reasonable person feel that he would not be free to leave[,]" Richardson, 385 F.3d at 629, and upon being accused of breaking the law by a uniformed police officer, a reasonable person would not feel free to leave.  These factors, considering the totality of the circumstances, lead to the conclusion that a reasonable person in Defendant's position would not have felt free to simply walk away from Vass and Pappas and terminate the encounter.

The Government argues that there is no evidence in the record indicating that Defendant believed that he was not free to leave (Gov't. Resp. p. 6, doc. # 33), but Defendant does not bear a burden to demonstrate that he did not consent to questioning: the burden is on the Government to establish that the encounter was consensual.  Royer, 460 U.S. at 497.  In this case, the circumstances surrounding Defendant's encounter with Vass and Pappas indicate that a reasonable individual in Defendant's situation would not have felt free to leave and ignore Vass and Pappas as they approached and told him that he was breaking the law.  The Court concludes that Defendant was seized within the meaning of the Fourth Amendment.

### B. The Seizure was Unreasonable

Having determined that Defendant was seized within the meaning of the Fourth Amendment, the Court turns to considering the question of whether that seizure was reasonable.  Defendant argues that "Officers Vass and Pappas could not have possessed reasonable, articulable suspicion that he was trespassing on CPO property" because he was standing on a public sidewalk, not on CPO property, when the officers approached and seized him. (Def. Supp. Br. p. 10, doc. # 32.)  The

Government responds by arguing that Vass and Pappas had reasonable suspicion to investigate whether criminal activity was afoot because of Vass' previous encounters with Defendant, and because he was "standing outside of a residential building at night in a high crime area on CPO property directly underneath a prominent sign that explicitly indicated 'No Trespassing' and 'No Loitering' amongst other things." (Gov.'t Resp. p. 11, doc. # 33.)

The Court finds that the seizure was not reasonable because Vass did not have reasonable suspicion to believe that Defendant was trespassing on CPO property. Defendant was standing on a public sidewalk when Vass approached and stated that Defendant was trespassing, not on CPO property as the Government argues, and Ohio law clearly states that actual entry onto the premises of another is required to commit trespass. OHIO REV. CODE ANN. § 2911.21 (LexisNexis 2002); c.f. State v. Newell, 93 Ohio App. 3d 609, 611, 639 N.E.2d 513 (1st Dist. 1994) (where State failed to prove that defendant was actually on housing authority's property, appellate court reversed criminal trespass conviction because of "a failure of proof by the state of one of the essential elements of the offense with which defendant was charged"). The fact that Vass observed Defendant standing on a public sidewalk in front of CPO property would not support a reasonable belief on Vass' part that Defendant was actually trespassing on CPO property; Vass never observed Defendant on CPO property and without such an actual entry Defendant could never commit criminal trespass. There were simply no "specific and articulable facts" that would have given rise to a reasonable suspicion that Defendant was trespassing, because all of the facts surrounding Defendant's location indicated that he was not on CPO property. Without a reasonable suspicion that Defendant was trespassing, there was no justification for Vass to seize Defendant for an investigatory detention.

The Government argues first that, because Defendant was ultimately charged with carrying

a concealed weapon and not criminal trespass, trespass law and the fact that Defendant did not actually trespass on CPO property are irrelevant. (Gov't. Resp. p. 8, doc. # 33.) The Court, however, agrees with Defendant's argument that the Government must show that the *initial detention*, as opposed to the ultimate charges, was supported by reasonable suspicion. Defendant was seized the moment that Vass stated that Defendant was trespassing, and at that moment Vass must have had a reasonable, articulable suspicion that criminal activity was afoot. Terry, 392 U.S. at 20. The only criminal activity that Vass was concerned with at the time was trespass, and the Court has already concluded that the fact that Defendant was not on CPO property means that it was unreasonable for Vass to suspect that Defendant was trespassing. Any information that Vass learned through later questioning, such as the fact that Defendant was in fact carrying a firearm, does not bear on the question of whether Vass' seizure of Defendant "was justified *at its inception*[.]" Id. (emphasis added).

The Government further argues that Vass and Pappas were engaged in "legitimate law enforcement activity as contemplated in Terry" (Gov't. Resp. p. 7, doc. # 33) when they approached Defendant because he was part of a group that was drinking and loitering outside of CPO property at night in a high crime area, and Terry recognizes that allowing police officers to investigate possible criminal activity serves a legitimate interest in crime prevention. (Id. p. 11.) This argument, however, does not help the Government's position. Terry does indeed state that crime prevention is an important interest that is served by allowing police officers to investigate possible criminal behavior, see id. at 22, but that does not change the fact that the officer's investigation and the basis for it must be reasonable, *i.e.* that the investigation must, at its inception, be based on reasonable suspicion.

The basis for Vass' seizure and investigation of Defendant was a suspicion of trespassing, not loitering or violating open container laws. Suspecting that others were violating loitering or open container laws says absolutely nothing about whether Vass had reasonable suspicion to seize and detain *Defendant* to investigate whether Defendant was trespassing. Vass did state that, when arriving at 1084 East Whittier, his intent was to approach the group and investigate loitering and open container violations (Vass Test. p. 56), but the question before the Court is not whether Vass had resonable suspicion to investigate other members of the group on that basis. Immediately upon recognizing Defendant, Vass completely ignored the other members of the group, approached Defendant, and immediately seized him by accusing him of trespass. *This* is the action that must be supported by reasonable suspicion, not the conduct of stopping the cruiser to investigate possible loitering or open container violations. The Fourth Amendment is only implicated when a seizure occurs, and the relevant question is whether the seizure of Defendant was supported by reasonable suspicion of criminal activity. As the Court has already held, however, Vass did not have reasonable suspicion that Defendant was trespassing, because he was standing on a public sidewalk, not on CPO property, and the seizure of Defendant and the subsequent interrogation and investigation of Defendant were unreasonable.

**IV.    Conclusion**

For the reasons stated above, the Court concludes that Defendant was seized within the meaning of the Fourth Amendment, and that that seizure was not based on reasonable suspicion. Because the initial seizure was unconstitutional, evidence obtained as a result of the questioning that occurred during that unlawful seizure must be suppressed as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963). The Court thus **GRANTS** Defendant's Motion to

Suppress Physical Evidence and Statements.  (Doc. # 16.)

**IT IS SO ORDERED**.


Date: October 27, 2008                                **/s/ John D. Holschuh**
                                                      John D. Holschuh, Judge
                                                      United States District Court